IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
ABILENE DIVISION

| | | |
|---|---|---|
| VINCENT LAMON WILLIAMS,<br>Institutional ID No. 01984628,<br>06421289 | § § § § | |
| Plaintiff, | § § | |
| | § | Civil Action No. 1:21-CV-00089-BU |
| v. | § § | |
| TDCJ ROBERTSON UNIT, *et al.*, | § § | |
| Defendants. | § § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS
OF THE UNITED STATES MAGISTRATE JUDGE**

Pro se plaintiff VINCENT LAMON WILLIAMS, an inmate with the Texas Department of Criminal Justice (TDCJ), brings this lawsuit under 42 U.S.C. § 1983, alleging violations of his constitutional rights during his incarceration. The Court denied Williams leave to proceed *in forma pauperis*, but he has paid the full filing fee. Dkt. No. 10. United States District Judge James Wesley Hendrix then transferred this case to the undersigned for an initial case review under 28 U.S.C. § 1915A. Dkt. No. 12. Williams has not consented to the undersigned exercising the jurisdiction of this Court; therefore, the undersigned submits these Findings, Conclusions, and Recommendations (FCR) regarding whether Williams's claims survive judicial screening.

After carefully considering the claims in Williams's Complaint and Supplemental Complaint, *see* Dkt. Nos. 1, 29, and the amendments to those claims through his responses to the Court's questionnaires, *see* Dkt. Nos. 16, 34, the undersigned RECOMMENDS that

1

the Court order service of one of Williams's claims and dismiss all other claims as frivo-lous, for failure to state a claim upon which relief may be granted, or for seeking relief from a defendant who is immune from such relief.

## I. JURISDICTION

Williams brings his claims under 42 U.S.C. § 1983, providing the Court with sub-ject-matter jurisdiction under 28 U.S.C. § 1331. Dkt. Nos. 1, 29. Venue is proper in the Northern District of Texas, Abilene Division, because Williams's claims arise from his incarceration at TDCJ's Robertson Unit located in Jones County, Texas. 28 U.S.C. § 1391(b)(2). The undersigned has the authority to enter these Findings, Conclusions, and Recommendations after United States District Court Judge James Wesley Hendrix trans-ferred Williams's case to the undersigned for preliminary screening. Dkt. No. 12; 28 U.S.C. § 636(c)(1).

## II. FACTUAL BACKGROUND

For purposes of screening a plaintiff's complaint under 28 U.S.C. §§ 1915(e)(2)(B) or 1915A, a court must accept well-pleaded factual allegations as true and construe them in a way that most favor the plaintiff. *Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 419 (5th Cir. 2017). A court may look to the plaintiff's allegations in their complaint, responses to a questionnaire, authenticated prison or jail records, and testimony provided at a *Spears* hearing. *See Berry v. Brady*, 192 F.3d 504, 507 (5th Cir. 1999); *see also Banue-los v. McFarland*, 41 F.3d 232, 234 (5th Cir. 1995) (holding that courts may consider au-thenticated medical and prison records).

Williams's claims center around three events during his time at the Robertson

Unit—one on January 13, 2020, another on February 20, 2020, and the last on August 18, 2022.

### A.    Events leading up to the January 2020 Incident

On December 22, 2019, Officer Jennifer Ochoa wrote Williams a disciplinary charge for masturbating in a public shower (hereinafter, "December 2019 Charge"). Dkt. No. 1 at 6. Sgt. Melissa Balderas investigated the charge, for which Williams was eventually convicted. *Id.*; Dkt. No. 16 at 1–2. Williams later filed an ombudsman complaint alleging Balderas's investigation was not proper. Dkt. No. 16 at 1–2.

Several days later, on December 27, Williams filed a Prison Rape Elimination Act (PREA) complaint against Ochoa, claiming she watched him shower. Dkt. No. 1 at 6. PREA coordinator Sgt. Justo Reyes investigated this complaint and came to Williams's cell on January 3, 2020, to speak with him. *Id.*; Dkt. No. 16 at 12. According to Williams, though, instead of investigating his claim, Reyes searched Williams's cell and "mistreat[ed]" his legal papers and property by pulling them from his locker and onto the floor and "put[ting] water" on them. Dkt. Nos. 1 at 6; 29-1 at 44. Reyes eventually left without taking Williams's statement because he did not have a pen and paper. Dkt. No. 1 at 6. Citing this alleged failure, Williams filed a complaint against Reyes. *Id.* Investigators for Williams's PREA complaint closed their investigation on January 14, 2020, citing a lack of corroborating evidence. *Id.* at 7.

On or about January 12, 2020, Ochoa returned to work in Williams's unit. *Id.* at 6. Soon after she returned, she allegedly harassed Williams by searching his cell and mistreating his property. *Id.*

3

**B.      January 2020 Incident**

Williams alleges that on January 13, 2020, officers used excessive force against him (hereinafter, "January 2020 Incident"). On that date, Ochoa opened the door to Williams's cell, and Officers Donovan O'Connor and Nicholas Villanueva rushed in and knocked Williams down. Dkt. No. 16 at 7. Once on the ground, Williams placed his hands behind his back, and an unidentified officer then placed their weight on his back to pin him down. *Id.* During this altercation, there were four officers in Williams's cell: O'Connor, Villanueva, Lt. Lance Lofton, and Officer Manuel Vasquez. While Williams was pinned on his stomach with his hands behind his back, these officers punched, kicked, choked him, and poked his eyes. *Id.* At some point, Williams screamed several times, prompting an officer to order the others to stop. *Id.* The officer had to repeat his order until the other officers finally stopped. *Id.*

Because this incident occurred inside Williams's cell, there are no videos capturing what happened. Williams concedes, however, that he was charged with biting O'Connor during the incident (hereinafter, "January 2020 Charge").[1] *Id.* at 3. He also admits that he was convicted on this charge, and it has not been overturned. *Id.* He nonetheless complains that his counsel substitute, Nina Lopez, denied him the opportunity to cross-examine witnesses and failed to obtain certain evidence he had requested. Dkt. No. 34 at 1.

---

[1] This conviction has not been overturned. Dkt. No. 16 at 3. It is unclear, however, when Williams bit O'Connor. Construing the facts in Williams's favor, the undersigned cannot say that *Heck* bars his excessive-force claim or his allegations that he was complying with orders and did not pose a threat when the use of force against him continued.

### C.    Medical care following the January 2020 Incident

Williams was seen by medical staff 20 minutes after the officers' use of force had ended. Dkt. No. 16 at 6. He avers that his injuries included the following: broken blood vessels in his eyes that later caused blurry vision and headaches; a broken eye socket and "pluse"[2] in his eyes; an unspecified head injury; and general body aches. Dkt. No. 34 at 9. While in medical, a nurse cleaned and bandaged Williams's wounds. Dkt. No. 16 at 6. Williams saw an unnamed doctor but complains that the doctor did not treat his injuries to his satisfaction. *Id.* He asked the doctor, "under what conditions do you have to view an inmate?" but the doctor ignored him. *Id.* Williams also claims that medical staff did not follow TDCJ procedure for documenting injuries following use-of-force incidents and did not X-ray his eye sockets or photograph his injuries. Dkt. No. 29-1 at 1.

After leaving the medical unit on January 13, Williams was placed in restrictive housing for several weeks. During that time, he experienced head and eye pain that caused him to black out. Dkt. No. 16 at 4–5, 8. William complains that he should have had "a follow up after he was seen by medical." *Id.* at 6. He maintains that he told "every" officer about his symptoms; however, they merely told him to fill out a medical request form. *Id.* at 7. Williams filed multiple such requests, and all were denied or ignored. *Id.* He then filed multiple grievances and outside complaints related to his lack of medical care. Dkt. No. 1 at 7.

Williams eventually saw medical on January 26. *Id.*; Dkt. No. 16 at 4. In his

---

[2] The undersigned is unsure if "pluse" is meant to be pus; Williams uses "pluse" multiple times throughout his pleadings and questionnaire responses.

Complaint, Williams says that he was not treated at this visit; however, he later admits that medical took his vitals, conducted an eye chart test, and prescribed him eye drops. Dkt. Nos. 16 at 7; 34 at 2. Williams saw medical again on January 30th. Dkt. No. 34 at 2.

### D.    February 2020 Incident

Williams alleges that on February 20, 2020, O'Connor, Villanueva, and "at least 15 other officers made an unsuccessful attempt to assault" him (hereinafter, "February 2020 Incident"). Dkt. No. 1 at 8. As Williams tells it,[3] he was standing next to his door when O'Connor, Villanueva, and the other officers approached his cell. *Id.* When officers opened the door, Williams stepped out and into an area where cameras could see. *Id.* He then placed his hands in the air and kneeled on the ground. Dkt. No. 16 at 9. The officers handcuffed Williams and called for a use-of-force camera, which took 30 minutes to arrive. *Id.*

Williams describes this incident as an "unsuccessful attempt" to assault him. Dkt. No. 1 at 8. He does not describe any physical injuries from this event and admits that he did not seek medical treatment afterward. Dkt. No. 16 at 10. Despite all this, he neverthe-less alleges that O'Connor "lightly" kicked and kneed him while he was handcuffed and the officers waited for the use-of-force camera to arrive. *Id.* at 9.

Williams also received a disciplinary charge from the February 2020 incident alleg-ing that he disrupted a CIT investigation. Dkt. No. 1 at 8. Unlike his other charges, this charge was dismissed. Dkt. No. 16 at 2–3.

---

[3] As discussed below, the authenticated records from TDCJ contain footage of this incident from two dif-ferent cameras.

### E.     August 2022 incident and aftermath

On August 18, 2022—while still at the Robertson Unit—Williams was involved in another use-of-force incident; however, he does not appear to allege that the force was excessive (hereinafter, "August 2022 Incident"). *See* Dkt. Nos. 29, 29-1, 34. Instead, he complains about the medical care he received—rather did not receive—afterward.

Williams suffered two primary injuries during the August 2022 Incident. First, he had several teeth knocked out. Dkt. No. 29-1 at 31. Second, Williams says that he suffered cuts to his wrists and ankles when officers carried him by his arms and legs while he was restrained, which caused the restraints to dig into his skin. Dkt. No. 34 at 13. Immediately following the incident, Williams was assigned to a cell in Ad-Seg and placed under constant and direct observation (CDO).

On August 23, Williams was seen by medical—specifically, Jackie Gregory. During this visit, Gregory looked inside Williams's mouth and assessed his wrist injuries. *Id.* at 5–6. Gregory also checked Williams's blood pressure and took a blood sample for testing. *Id.* at 5.

Williams remained in Ad-Seg until August 29, when he was transferred to the Montford Unit. *Id.* Upon his arrival at the Montford Unit, he was provided treatment for his wrist injuries, including cleaning and bandaging the wounds, changing his dressings daily, prescribing him antibiotics for an infection, and providing therapy for nerve damage. *Id.* at 5, 17. As for Williams's teeth, he complains that he did not receive dental treatment until November or December 2022, when he was seen by a dentist, had his mouth X-rayed, and was given ibuprofen for his pain. *Id.* at 4, 6. Williams was charged $26 in fees for his dental

care, which he claims was excessive. Dkt. No. 29-1 at 37.

### F.    Miscellaneous allegations

Williams levies a series of allegations that, in combination with the acts above, are part of "a campaign of negligence and harassment" against him. Dkt. No. 29 at 2. He claims that:

- His grievances and PREA complaint against Ochoa were ignored or improperly investigated, Dkt. No. 29-1 at 32;
- His requests to see safe prisons at Montford were denied or ignored, *id.* at 44;
- His mail was withheld for six months, *id.* at 45;
- Administrators delayed and ultimately failed to effect custody and status changes, *id.*;
- He had fraudulent fees on one of his inmate debit accounts, *id.* at 59;
- He was issued two broken tablets, including one without earbuds, *id.*; and
- The phone apps on his tablets did not work and IT failed to help him, *id.*

Williams says that various agencies inside TDCJ are part of this campaign and that all TDCJ staff have "practice[d] negligence when individually dealing with me as an inmate." *Id.*

## III.  THE PARTIES

Williams filed his Complaint on May 14, 2021. Dkt. No. 1. He moved for leave to proceed *in forma pauperis*, which the Court denied, and he later paid the filing fee. Dkt. Nos. 8, 10; *see also* Dkt. No. 11. The case was then transferred to the undersigned to conduct judicial screening under 28 U.S.C. § 1915A. Dkt. No. 12. The undersigned received authenticated records from TDCJ, Dkt. Nos. 17, 35, and ordered Williams to supplement his claims by responding to the Court's questionnaires, Dkt. Nos. 16, 34. The Court also permitted Williams to file a Supplemental Complaint in which he expounded upon his

allegations in his original Complaint and added his allegations and claims arising from the August 2022 Incident. Dkt. No. 29.

All said, Williams brings claims against the following defendants: (1) Officer Jennifer Ochoa; (2) Sgt. Justo Reyes; (3) Sgt. Melissa Balderas; (4) Officer Donovan O'Connor; (5) Officer Nicholas Villanueva; (6) Lt. Lance Lofton (7) Officer Manuel Vasquez; (8) 15 Unknown Officers; (9) Counsel Substitute Nina Lopez; (10) Unknown Medical Staff #1; (11) Jackie Gregory; (12) Unknown Medical Staff #2; (13) Unknown Dental Staff; (14) Unknown Grievance Officers; (15) Unknown Safe Prison/PREA Investigators; (16) Unknown TDCJ Administrators; (17) Unknown Mailroom Staff; (18) Unknown Securus Tech Department Staff; (19) Unknown TDCJ Staff; and (20) TDCJ.

## IV.  LEGAL STANDARDS

A court must dismiss a complaint filed *in forma pauperis* or filed by a prisoner against a government entity or employee if the court determines the complaint is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. §§ 1915(e)(2)(B); 1915A(b) (applying section to any suit by a prisoner against certain governmental entities, regardless of whether the prisoner is proceeding *in forma pauperis*).

A frivolous complaint lacks any arguable basis, either in fact or in law, for the wrong alleged. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). A complaint lacks an arguable basis in fact if it rests upon clearly baseless factual contentions, and similarly, it lacks an arguable basis in law if it contains indisputably meritless legal theories. *See id.* at 327; *Geiger v. Jowers*, 404 F.3d 371, 373 (5th Cir. 2005).

9

Dismissal for failure to state a claim—whether under Section 1915(e)(2)(B)(ii), Section 1915A(b)(1), or Rule 12(b)(6)—"turns on the sufficiency of the 'factual allegations' in the complaint." *Smith v. Bank of Am., N.A.*, 615 F. App'x 830, 833 (5th Cir. 2015) (per curiam) (quoting *Johnson v. City of Shelby*, 574 U.S. 10, 12 (2014) (per curiam)). Thus, if a plaintiff "plead[s] facts sufficient to show" that the claims asserted have "substantive plausibility" by stating "simply, concisely, and directly events" that they contend entitle them to relief, the claims should not be dismissed merely because the plaintiff fails to articulate the proper legal theory that otherwise makes those facts actionable in court. *Johnson*, 574 U.S. at 11–12 (citing Fed. R. Civ. P. 8(a)(2)–(3), (d)(1), (e)).

Courts accept *well-pleaded* factual allegations as true. *Chhim v. Univ. of Tex. at Austin*, 836 F.3d 467, 469 (5th Cir. 2016). This means the factual allegations, while not required to be detailed, must amount to more than mere labels, conclusions, or a statement of the legal elements of a claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also Chhim*, 836 F.3d at 469.

For claims to be substantively plausible, a plaintiff need not establish that the pleaded facts probably occurred as alleged, but the facts must allow the court "to infer more than the mere possibility of misconduct." *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 796 (5th Cir. 2011) (quoting *Iqbal*, 556 U.S. at 678–679). Even pro se plaintiffs must plead facts that raise the right to relief above a speculative level. *Chhim*, 836 F.3d at 469 (citing *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002)). And when plaintiffs "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *Twombly*, 550 U.S. at 570.

When evaluating a complaint under these standards, courts liberally construe the pleadings of pro se plaintiffs, holding their complaints to "less stringent standards than formal pleadings drafted by lawyers." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). But "liberal construction does not require that the Court . . . create causes of action where there are none." *Smith v. CVS Caremark Corp.*, No. 3:12-cv-2465-B, 2013 WL 2291886, at *8 (N.D. Tex. May 23, 2013). "To demand otherwise would require the 'courts to explore exhaustively all potential claims of a *pro se* plaintiff'" and would "'transform the district court from its legitimate advisory role to the improper role of an advocate seeking out the strongest arguments and most successful strategies for a party.'" *Jones v. Mangrum*, No. 3:16-cv-3137, 2017 WL 712755, at *1 (M.D. Tenn. Feb. 23, 2017) (quoting *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985)).

Ultimately, "'[d]etermining whether a complaint states a plausible claim for relief' is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 899 (5th Cir. 2019) (quoting *Iqbal*, 556 U.S. at 679).

## V. ANALYSIS

To state a claim under 42 U.S.C. § 1983, Williams must "allege facts showing that a person, acting under color of state law, deprived the plaintiff of a right, privilege or immunity secured by the United States Constitution or the laws of the United States." *Bryant v. Mil. Dep't of Miss.*, 597 F.3d 678, 686 (5th Cir. 2010).

### A.   Ochoa

Williams alleges that Ochoa's filing of the December 2019 Charge violated his rights to due process, which the undersigned construes as a claim under the Fourteenth Amendment. He also alleges that she sexually harassed him by watching him shower in violation of PREA and the Eighth Amendment. Last, the undersigned construes Williams's claim that Ochoa searched his cell and mistreated his property as bringing claims under the Fourth and Fourteenth Amendments.

*Due Process*. Williams claims that Ochoa's actions in charging him with the December 2019 Charge violated his rights under the Due Process Clause of the Fourteenth Amendment. This claim is barred by *Heck v. Humphrey*, 512 U.S. 477 (1993). "In *Heck*, the Supreme Court held that if a plaintiff's civil rights claim for damages challenges the validity of his criminal conviction, and the plaintiff cannot show such conviction or sentence has been reversed, invalidated, or otherwise set aside, the claim is not cognizable under § 1983." *Magee v. Reed*, 912 F.3d 820, 822 (5th Cir. 2019) (per curiam) (citing *Heck*, 512 U.S. at 486–87). "A § 1983 claim which falls under the rule in *Heck* is legally frivolous unless the conviction or sentence at issue has been reversed, expunged, invalidated, or otherwise called into question." *Hamilton v. Lyons*, 74 F.3d 99, 102 (5th Cir. 1996) (citation omitted). This rule applies to prison disciplinary convictions. *Clarke v. Stalder*, 154 F.3d 186, 189 (5th Cir. 1998).

The December 2019 Charge has not been overturned or otherwise invalidated, thereby precluding a finding that Ochoa's actions violated Williams's due process rights.

*PREA and Eighth Amendment*. Williams alleges that Ochoa violated PREA and the Eighth Amendment by watching him shower, claiming that this constitutes sexual abuse. Starting with PREA, that statute does not create a private cause of action. *Krieg v. Steele*, 599 F. App'x 231, 232–33 (5th Cir. 2015). Accordingly, PREA "cannot serve as a basis for liability" when an inmate alleges that their rights under the Act were violated. *Lane v. Rupert*, Civil Action No. 6:14CV14, 2016 WL 1068199, at *3 (E.D. Tex. Mar. 18, 2016).

To state an Eighth Amendment claim based on allegations of sexual abuse, a plaintiff must satisfy a two-part test involving an objective and subjective element. *See Harper v. Showers*, 174 F.3d 716, 719–20 (5th Cir. 1999). First, the alleged sexual abuse or assault must be objectively and sufficiently serious. *Farmer*, 511 U.S. at 834. Isolated incidents of sexual harassment and touching are not sufficiently serious enough to violate a prisoner's rights under the Eighth Amendment. *Boddie v. Schneider*, 105 F.3d 857, 861 (2d Cir. 1997). Second, upon proof that the sexual assault was objectively serious, Williams must next prove that the prison officials involved acted with deliberate indifference, *i.e.*, a sufficiently culpable state of mind. *Harper*, 174 F.3d at 720.

Williams alleges a single instance where Ochoa viewed him while he was showering. Even if characterized as sexual harassment, an isolated incident of non-physical harassment is insufficient to trigger constitutional attention. *See Boddie*, 105 F.3d at 861.

*Fourth and Fourteenth Amendments*. Williams alleges that Ochoa's search of his cell was unreasonable and deprived him of his property by mistreating it. "Prisoners retain, at best, a very minimal Fourth Amendment interest in privacy after incarceration." *Oliver v. Scott*, 276 F.3d 736, 744 (5th Cir. 2002). Critically, the Fourth Amendment's protection

13

against unreasonable searches does not apply to prison cells. *Hudson v. Palmer*, 468 U.S. 517, 530 (1984). Simply put, Williams cannot seek to vindicate a right he did not have.

Furthermore, Williams's remedy for any deprivation of property is through a state-law conversion claim, not one under § 1983. *See Stauffer v. Gearhart*, 741 F.3d 574, 583 (5th Cir. 2014) ("In Texas, when an inmate's property is taken without compensation, his remedy is in state court, not federal court.") (citing *Thompson v. Steele*, 709 F.2d 381, 383 (5th Cir. 1983)).

Accordingly, the Court should dismiss these claims against Ochoa as frivolous.

### B.    Reyes

Williams sues Reyes for searching his cell, mistreating his property, and failing to undertake a more thorough investigation into his PREA complaint. Dkt. No. 29-1 at 44. The undersigned construes these allegations as bringing an unreasonable search claim under the Fourth Amendment, a deprivation-of-property claim under the Fourteenth Amendment, and a denial-of-due-process claim under that same Amendment.

Williams claims under the Fourth and Fourteenth Amendments alleging an unreasonable search and deprivation of property fail for the reasons just discussed. Williams also complains that Reyes denied him due process by insufficiently investigating his PREA complaint against Ochoa. Inmates do not have a right to have their PREA complaints investigated to their satisfaction. *Alexander v. Wright*, No. CV 19-507-SDD-EWD, 2021 WL 3237311, at *2–3 (M.D. La. June 29, 2021) (collecting cases), *R. & R. adopted*, 2021 WL 3234612. Thus, Williams cannot bring a claim premised on Reyes's investigatory efforts or lack thereof, and the Court should dismiss this claim as legally frivolous.

14

C.    **Balderas**

Williams sues Balderas for her investigation of the December 2019 Charge. The undersigned construes this as a claim under the Fourteenth Amendment's Due Process Clause. Courts have rejected the notion that the Due Process Clause requires a proper investigation into a prison disciplinary charge. *See Washington v. LeBlanc*, No. 12-269-JJB-RLB, 2015 WL 6163448, at *2 (M.D. La. Oct. 2, 2015) (collecting cases), *R. & R. adopted*, 2015 WL 6163163. For this reason, Williams's claim against Balderas is legally frivolous.

D.    **O'Connor, Villanueva, Lofton, Vasquez, and 15 Unknown Officers**

Williams sues Officers O'Connor and Villanueva for excessive use of force under the Eighth Amendment for both the January 2020 and February 2020 Incidents. He also alleges an Eighth Amendment excessive-force claim against Lofton and Vasquez for their role in the January 2020 Incident. Last, Williams sues 15 Unknown Officers for their actions during the February 2020 Incident.

To establish a constitutional violation for excessive use of force by a prison official, a plaintiff must show that the defendant unnecessarily and wantonly inflicted pain. *See Whitley v. Albers*, 475 U.S. 312, 319–21 (1986). Whether an official's use of force is unnecessary or wanton depends on whether the "force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson*, 503 U.S. at 6 (quoting *Whitley*, 475 U.S. at 320–21). Factors relevant to this determination include, but are not limited to, the following: (1) the extent of the prisoner's injury; (2) "the need for application of force;" (3) "the relationship between that need and the amount of force used;" (4) "the threat reasonably perceived by the

responsible" officers; and (5) any efforts officers made to temper the severity of a forceful response. *Id.* at 7 (internal quotation marks omitted); *Baldwin v. Stalder*, 137 F.3d 836, 838 (5th Cir. 1998).

Given the need for close scrutiny of the facts, the undersigned will address each alleged use of force in turn.

### 1.    *January 2020 Incident*

Williams claims that on January 13, 2020, Ochoa opened the door to Williams's cell, and Officers Donovan O'Connor and Nicholas Villanueva rushed in and knocked him down. Once on the ground, Williams placed his hands behind his back, and an officer then placed their weight on his back to pin him down. While Williams was pinned on the ground with his hands behind his back, O'Connor, Villanueva, Lofton, and Vasquez punched, kicked, and choked him, and poked his eyes. When Williams screamed several times, an officer ordered the others to stop. The officer had to repeat the order several times until the other officers finally stopped. Williams states that he suffered injuries to both of his eyes, other parts of his face and head, and his lower back.

In determining what amount of force is constitutionally permissible, the force "must be judged by the context in which that force is deployed." *Ikerd v. Blair*, 101 F.3d 430, 434 (5th Cir. 1996). Moreover, the core inquiry is whether the force alleged was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Moore v. Nixon*, No. 5:16-CV-119-BQ, 2017 WL 11476340, at *2 (N.D. Tex. Apr. 25, 2017), *R. & R. adopted*, 2018 WL 10149999 (citing *Wilkins v. Gaddy*, 559 U.S. 34, 37–38 (2010)).

16

Here, Williams alleges that the officers use of force came after he was already pinned to the ground with his hands behind his back. Accepting these allegations as true, as the Court must during this stage of the proceedings, the undersigned finds that Williams has plausibly alleged that the force used exceeded that which the Constitution allows. Accordingly, Williams's excessive force claims against O'Connor, Villanueva, Lofton, and Vasquez from the January 2020 Incident should survive screening.

### 2.    *February 2020 Incident*

The February 2020 Incident merits a different outcome, in part because authenticated records from TDCJ contain footage of the incident. Williams alleges that on February 20, 2020, he was standing next to his cell door when he was approached by O'Connor, Villanueva, and unknown officers. When the officers opened his door, he stepped out of his cell, placed his hands in the air, and kneeled on the ground. The officers handcuffed Williams and then called for a use-of-force camera, which took 30 minutes to arrive. Williams says that this was an "unsuccessful attempt" to assault him and does not describe any physical injuries as a result of the officers' actions. Dkt. No. 1 at 8. Despite this, he does claim that O'Connor "lightly" kicked and kneed him while he was handcuffed, and the officers were waiting for the use-of-force camera to arrive. Dkt. No. 16 at 9.

Footage of the incident is generally consistent with parts of Williams's telling of events; however, the footage directly and clearly contradicts several aspects of his recollection. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) (holding that the district court did not have to accept the plaintiff's description of his driving where it was "blatantly contradicted by" video from the police car's dashcam).

17

The first angle of the Incident comes from surveillance cameras and shows a team of officers approaching Williams's cell on the unit's third floor. The door to Williams's cell is closed as the officers approach. When one of the officers opens the door to the cell, Williams's arm can be seen reaching out across the door frame. The video footage is clear that Williams did not step out of his cell before officers could act; rather, it shows officers pulling him out of the cell and onto the floor to restrain him. This is where the footage from a handheld camera begins. Both cameras show officers restraining Williams on the floor and keeping him there for several minutes while other officers search his cell. He is then escorted elsewhere without further incident.

Based on this footage, there is no indication that an officer kicked Williams intentionally. If there was any force applied to Williams—beyond the force used to pull him from his cell and restrain him—it was innocuous. Combined with the fact that Williams himself downplays the force used against him as "light[]" and the entire incident as an "attempted use of force," for which he disclaimed the need for medical attention, Dkt. No. 16 at 9, the undersigned finds that there can be no excessive force claim based on the February 2020 incident. *See Williams v. Bramer*, 180 F.3d 699, 703–04 (5th Cir. 1999) (affirming dismissal of excessive-force claim because the only injury was "fleeting dizziness, temporary loss of breath and coughing").

### E.    Substitute Counsel

The allegations regarding Lopez center on her actions during Williams's disciplinary hearing for biting O'Connor, namely that she did not allow him to call and cross-examine witnesses and failed to obtain certain evidence he sought to include as part of his

defense. *See* Dkt. No. 34 at 1. The undersigned construes these allegations as bringing claims under the Fourteenth Amendment for denial of due process and the Sixth Amendment for ineffective assistance of counsel and violation of the Amendment's Confrontation Clause.

At the outset, the undersigned notes that most—if not all—of these claims are *Heck* barred because a finding in Williams's favor would imply the invalidity of a disciplinary conviction that has not been overturned. *See Mouton v. Louisiana*, 572 F. App'x 502, 502–03 (5th Cir. 2013) (per curiam) (holding *Heck* barred § 1983 claim alleging ineffective assistance of counsel).

More than that, though, "[p]rison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply." *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974). Courts have disclaimed the idea that a prisoner has the right to cross-examine witnesses or is entitled to the effective assistance of a counsel substitute at a prison disciplinary proceeding. *Id.* (cross-examination); *Broussard v. Johnson*, 253 F.3d 874, 876 (5th Cir. 2001) (same); *Baxter v. Palmigiano*, 425 U.S. 308, 315 (1976) (effective assistance of counsel); *Wainwright v. Torna*, 455 U.S. 586, 587–88 (1982) (same). Therefore, the claims against Lopez are legally frivolous.

## F.    Gregory, Unknown Medical Staff #1, Unknown Medical Staff #2, Unknown Dental Staff

Williams alleges that, in the wake of the January 2020 Incident, a group of unknown medical staff were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. He also brings deliberate-indifference claims against Gregory for her

19

actions following both the January 2020 and August 2022 Incidents. Williams sues a sec-
ond group of unnamed medical staff for their response following the August 2022 Incident,
alleging that they were deliberately indifferent to his medical needs. Last, he sues Unknown
Dental Staff for deliberate indifference, citing the delay in his dental treatment. *See* Dkt.
No. 29-1 at 31. He also complains that he was charged excessive fees for dental services.

Under the Eighth Amendment, prison officials must provide adequate medical care.
*Rogers v. Boatright*, 709 F.3d 403, 409 (5th Cir. 2013). An inmate seeking to establish an
Eighth Amendment violation regarding medical care must allege facts showing that prison
officials were deliberately indifferent to his serious medical needs. *Morris v. Livingston*,
739 F.3d 740, 747 (5th Cir. 2014) (explaining that because "only the 'unnecessary and
wanton infliction of pain' implicates the Eighth Amendment, a prisoner advancing such a
claim must, at a minimum, allege 'deliberate indifference' to his 'serious' medical needs")
(quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991) (emphasis in original)).

"Deliberate indifference" means that the denial of medical treatment was "much
more likely than not to result in serious medical consequences, and additionally that the
defendants had sufficient knowledge of the situation so that the denial of medical care con-
stituted wanton disregard of the prisoner's rights." *Johnson v. Treen*, 759 F.2d 1231, 1238
(5th Cir. 1985). In other words, "the plaintiff must show that the officials refused to treat
him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar
conduct that would clearly evince a wanton disregard for any serious medical needs." *Kel-
son v. Clark*, 1 F.4th 411, 417 (5th Cir. 2021)

To successfully claim a deliberate indifference to medical needs, a plaintiff must satisfy both an objective and subjective test. *Rogers*, 709 F.3d at 410. An inmate must first prove an objective exposure to a substantial risk of serious bodily harm. *Gobert v. Caldwell*, 463 F.3d 339, 345–46 (5th Cir. 2006). As to the subjective component, a prison official acts with deliberate indifference only where he (1) knows the inmate faces a substantial risk of serious harm and (2) disregards that risk by failing to take reasonable measures to abate it. *Id.* at 346; *see also Harris v. Hegmann*, 198 F.3d 153, 159 (5th Cir. 1999).

Allegations of malpractice, negligence, or unsuccessful treatment fail to establish deliberate indifference. *Gobert*, 463 F.3d at 346. Similarly, an inmate's disagreement with the medical treatment provided does not give rise to a constitutional claim. *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997). "[T]he decision whether to provide additional treatment 'is a classic example of a matter for medical judgment.'" *Domino v. Tex. Dep't of Crim. J.*, 239 F.3d 752, 756 (5th Cir. 2001) (quoting *Estelle*, 429 U.S. at 107). "And, the 'failure to alleviate a significant risk that [the official] should have perceived, but did not' is insufficient to show deliberate indifference." *Id.* (quoting *Farmer*, 511 U.S. at 838).

### 1.   *Medical care following January 2020 Incident*

Williams complains that he received inadequate care following the use of force on January 13, 2020. Immediately following the use of force, Williams was escorted to medical where a nurse cleaned and dressed his wounds. A doctor was also nearby at the time, but he did not provide any treatment even after Williams asked that he do so. Williams was then placed in Ad-Seg and did not see medical again until January 26. Williams says that during this interim period, he experienced pain, blurred vision, swelling, and potential

21

blackouts. He reported his symptoms to officers, who provided him with forms to request medical and possibly ibuprofen as well. *See* Dkt. No. 34 at 13 ("I may have been given Ibuprofen a few days but cannot remember."). On January 26, Williams saw medical where Gregory took his vitals, conducted an eye chart test, and prescribed him eye drops. *See id.* at 2; Dkt. No. 16 at 7. He visited medical again on January 30 but does not describe what occurred at that visit.

Under these facts, Williams's injuries objectively appear to have been sufficiently serious. Further, the undersigned presumes that staff were subjectively aware of these injuries. Missing, though, are any indications that staff consciously disregarded Williams's medical needs. Staff assessed Williams soon after the use of force on January 13. A nurse then dressed his wounds. Later—albeit nearly two weeks later—Gregory evaluated Williams by taking his vitals, administering an eye chart test, and prescribing him eye drops. These admitted-to facts cut against the conclusion that staff deliberately ignored any serious medical needs Williams faced.

At their very essence, Williams's allegations are disagreements with care. He asserts that the staff who initially treated him should have set up follow-up care for the days following Williams's injuries. Even if so, it does not mean that staff exhibited deliberate indifference. Again, "the decision whether to provide additional treatment 'is a classic example of a matter for medical judgment.'" *Domino*, 239 F.3d at 756. So, too, the decision not to order X-rays of Williams's head. *Estelle*, 429 U.S. at 107.

In sum, the undersigned submits that Williams's allegations that staff were deliberately indifferent to his serious medical needs following the use of force during the January 2020 Incident fail to state a claim upon which relief may be granted.

### 2. *Care following August 2022 Incident*

Williams also alleges that Gregory and other medical staff were deliberately indifferent to the injuries he suffered as a result of the August 2022 Incident. He claims that officers used force against him on August 18, 2022; however, he does not provide any details about the use of force other than to describe his injuries.[4] Williams says that he had four teeth knocked out and injuries to his wrists and ankles caused by his restraints when officers lifted him up. He was placed in Ad-Seg following the August 2022 Incident, where he remained until he left the Robertson Unit for Montford.

Williams claims he did not go to medical for his injuries until August 23. On August 23, he saw Gregory, who looked inside his mouth and assessed the wounds to his wrists. Dkt. No. 34 at 3, 17. At that visit, Williams had his blood taken for testing. *Id.* at 4.

Williams has several complaints about the medical staff's treatment of these injuries. First, he complains that officers involved in the use of force on August 18 should have taken him to medical for evaluation. Second, he takes issue with not being seen by medical

---

[4] Authenticated records suggest that this use of force came after Williams swung a sock stuffed with a fan motor at officers. Although Williams only mentions a single use of force in August 2022, the records make clear that there were actually two use-of-force incidents. The first was on August 18 and the second four days later on August 22. Footage found in the authenticated records shows that on this second occasion, Williams was in a cell when an officer noticed him acting unusual. Reports following the incident suggest Williams was cutting himself with a razor at the time, which, when noticed by officers, prompted them to intervene. Williams acknowledges that he was suicidal around this time and had recently made an attempt, however, he fails to mention anything regarding the events on August 22 in his submissions to the Court. *See* Dkt. No. 34 at 5.

until five days after he suffered his injuries. Third, he criticizes Gregory and other staff for not treating his injuries when he was seen. He maintains that Gregory should have referred him to dental for his teeth and made sure that the wounds to his wrist and ankles were treated.

Initially, the undersigned cannot find deliberate indifference in any failure to immediately take Williams to medical following the use of force on August 18.[5] While his injuries may have been more than *de minimis*, they were not life-threatening or especially urgent to warrant immediate medical attention. This is critical because at the time the officers had to decide whether to take Williams to medical, he was a continuing threat to himself and staff. Records suggest that even after he was restrained on a gurney, he attempted—or in fact did—bite staff. Given that Williams's injuries were not of such severity that the denial of immediate medical treatment was "much more likely than not to result in serious medical consequences," *Treen*, 759 F.2d at 1238, the undersigned cannot say that the decision to place Williams in Ad-Seg without seeing medical staff first exhibited a conscious disregard for his medical needs. *Epley v. Lopez*, No. 1:18-CV-00115-BU, 2023 WL 2483502, at *12 (N.D. Tex. Feb. 27, 2023) ("Without other hallmarks of an objectively serious medical need, or serious medical consequences for non-treatment like surgical intervention, complaints of pain and non-life-threatening injuries cannot constitute a serious medical need."); *see also Petzold v. Rostollan*, 946 F.3d 242, 249–50 (5th Cir. 2019) (no

---

[5] Authenticated records suggest Williams *was* seen by medical on August 18. Williams *was not* seen by medical after the use of force on August 22 because staff were concerned that Williams remained a danger to himself and others. Williams appears to confuse these events, but even so, the undersigned cannot take the timeline in the records as true because Williams clearly alleges that he was not seen by medical on August 18.

deliberate indifference where a prisoner limped and continued to complain of pain, which was diagnosed as a fracture two days later.)

Williams next complains that he was not seen by medical for his injuries until August 23. A delay in medical care can constitute an Eighth Amendment violation if deliberate indifference results in substantial harm. *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993). Substantial harm occurs when a plaintiff suffers lasting complications from the injury. *Easter v. Powell*, 467 F.3d 459, 464 (5th Cir. 2006). Williams has not shown that he suffered substantial harm as a result of the five-day delay between when he was injured and when he was seen by medical. Although Williams repeatedly raises the possibility of infection, he does not allege that his wounds became infected between August 18–23. Thus, he has failed to adequately allege a claim for delay in care.

Finally, Williams says Gregory and staff should have done more to treat his injuries. He acknowledges that Gregory looked in his mouth and assessed his wrist injuries. Gregory also had Williams's blood tested. Williams's discontent with the fact that Gregory did not do more is nothing more than a disagreement with care that cannot sustain a claim of deliberate indifference. *See Barnes v. Johnson*, 204 F. App'x 377, 379 (5th Cir. 2006) ("[Plaintiff's] assertion that [the defendant] did no more than a cursory examination but did not conduct a more through [sic] 'physical' examination . . . alleges, at most, negligence or medical malpractice, which do not give rise to a § 1983 cause of action, and an inmate's disagreement with his medical treatment does not establish a constitutional violation.").

Williams has not alleged that Gregory ignored his complaints completely, intentionally gave him improper treatment, or denied him treatment already prescribed to him.

### 3.    *Failure to properly document injuries and provide copies of records*

Williams raises three other perceived deficiencies regarding his medical care. Starting off, he complains medical staff did not follow procedures for documenting use-of-force injuries following the Incidents. Dkt. No. 29-1 at 1–2. Next, he mentions that he and his family requested his medical records but never received them. *Id.* Finally, he takes issue with the fact that he was not seen by dental until several months after his teeth were knocked out, and when he was seen, he was charged $26 for the care he received. None of these complaints rise to the level of constitutional violation.

First, the law is clear that prison officials do not violate the Constitution merely because they violated or failed to adhere to prison regulations. *Wolters v. Fed. Bureau of Prisons*, 352 F. App'x 926, 928 (5th Cir. 2009) (per curiam) ("violations of prison rules or regulations, without more, do not give rise to a cause of action"). Thus, Williams's rights were not violated by the medical staff's failure to follow prison policy for documenting injuries following a use-of-force incident.

Second, the undersigned is unaware of any authority recognizing a prisoner's constitutional entitlement to a copy of their medical records. *See Acara v. Banks*, 470 F.3d 569, 571–72 (5th Cir. 2006) ("We hold there is no private cause of action under HIPAA and therefore no federal subject matter jurisdiction over Acara's asserted claims").

Last, Williams has not shown that dental staff were aware of his injuries. Rather, his primary complaint has been the fact that he was not given a referral to see a dentist. Because a defendant cannot be deliberately indifferent to medical needs of which they are not aware, dental staff here could not have been deliberately indifferent to Williams's dental injuries.

Moreover, Williams's complaint of being charged fees for his dental care is inapposite given Fifth Circuit caselaw upholding as constitutional the assessment of fees for medical services. *See Morris*, 739 F.3d at 748 (rejecting plaintiff's argument that a TDCJ policy requiring inmates to pay an annual medical care fee violated plaintiff's constitutional rights because plaintiff failed to show he was personally denied medical treatment due to his inability to pay the fee); *see also Ward v. Gloor*, Civil Action No. V– 14–0036, 2014 WL 2949454, at *2 (S.D. Tex. June 30, 2014) (explaining that "inmates do not have a constitutional right to healthcare without incurring any financial indebtedness, even if they are indigent, and they may be obligated to make partial or deferred payments as money becomes available to them in the future.") (citing *Morris*, 739 F.3d at 746–47).

## I.    Unknown Grievance Officers

Williams claims that various grievance investigators failed to adequately investigate or otherwise respond to his complaints and grievances. *See* Dkt. Nos. 29-1 at 1–2, 32; 1 at 3. The undersigned construes these allegations as bringing a due process claim under the Fourteenth Amendment. These claims are not of constitutional concern because prisoners do "not have a federally protected liberty interest in having [their] grievances resolved to [their] satisfaction," and an alleged § 1983 due process violation for failure to investigate grievances is "indisputably meritless." *Hill v. Walker*, 718 F. App'x 243, 250 (5th Cir. 2018) (per curiam) (citing *Geiger*, 404 F.3d at 373–74). Therefore, Williams's claim should be dismissed as legally frivolous.

### J.    Unknown Safe Prison/PREA Investigators

Williams alleges that his PREA complaint against Ochoa was not properly investigated, which the undersigned construes as bringing a claim under the Due Process Clause of the Fourteenth Amendment. *See* Dkt. No. 29-1 at 44. He also says that he requested to see a Safe Prisons coordinator while at the Montford Unit but was unable to do so. The undersigned construes this as a failure-to-protect claim under the Eighth Amendment.

As already addressed, prisoners do not have a due process right in the handling of their PREA complaints. *Alexander*, 2021 WL 3237311, at *2–3. Williams also alleges that he was unable to speak to a Safe Prisons coordinator while at Montford. To bring a failure-to-protect claim, a prisoner must plausibly demonstrate that: (1) he was incarcerated under conditions that posed a substantial risk of harm and (2) officials were deliberately indifferent to "a sufficiently substantial risk of serious damage to [the prisoner's] future health." *Farmer*, 511 U.S. at 843 (citation and internal quotation marks omitted).

Again, "[d]eliberate indifference is an extremely high standard to meet." *Domino*, 239 F.3d at 756. Still, a plaintiff does not need to show that a defendant knew of the specific harm that befell the plaintiff. *Farmer*, 511 U.S. at 842. Instead, a plaintiff may proceed by presenting evidence of a substantial risk of harm that "was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past," and show that the defendant had been exposed to that information. *Id.* at 842–43.

The known risk cannot be just any risk but must be "excessive." *Brewster v. Dretke*, 587 F.3d 764, 770 (5th Cir. 2009). This is because "[p]rison officials are not . . . expected to prevent all inmate-on-inmate violence." *Adames v. Perez*, 331 F.3d 508, 512 (5th Cir.

2003). And a jail official's "failure to alleviate a significant risk that [the official] should have perceived, but did not, is insufficient to show deliberate indifference." *Domino*, 239 F.3d at 756 (quoting *Farmer*, 511 U.S. at 838) (internal quotation marks omitted).

Williams sought out Safe Prisons at Montford citing his fear that he would suffer harm back at the Robertson Unit. *See* Dkt. No. 29-1 at 33–34. Given that he was no longer at the Robertson Unit, and his only fear was a risk of harm back at the Robertson Unit, the undersigned cannot say that Williams faced a substantial risk of harm or that a defendant was deliberately indifferent toward that risk. As a result, Williams's claims against Unknown Safe Prison/PREA Investigators should be dismissed as frivolous.

### K.    Unknown TDCJ Administrators

Williams complains that TDCJ Administrators delayed administrative status reviews and failed to make custody and other status changes. *See* Dkt. No. 29-1 at 45. The undersigned construes this as a procedural due process claim under the Fourteenth Amendment. Any due process claim brought by a prisoner that is based on their custodial status runs into the well-established principle that "[p]rison officials must have broad discretion, free from judicial intervention, in classifying prisoners in terms of their custodial status." *Wilkerson v. Maggio*, 703 F.2d 909, 911 (5th Cir. 1983) (quoting *McGruder v. Phelps*, 608 F.2d 1023, 1026 (5th Cir. 1979)). Thus, to bring a due process claim based on custody status, a prisoner must show an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). The prisoner must then show that they received constitutionally insufficient process. *Luken v. Scott*, 71 F.3d 192, 194 (5th Cir. 1995)

29

Williams cannot establish these necessary elements. For one, he has not shown that the custodial status visited upon him "atypical and significant" hardships distinct from those inherent in ordinary prison life. *See id.* at 193. For another, he fails to describe the alleged procedural shortcomings with sufficient particularity. While he complains that reviews of his status may have been delayed,[6] he does not allege that he was wholly denied an opportunity to petition for a status change. Rather, the records he attaches to his Supplemental Complaint indicate that administrators held such reviews. *See* Dkt. No. 29-1 at 43. Even more, these records show that Williams had his line status and good-time credits restored after one of his disciplinary charges was overturned. *Id.* In short, Williams has failed to state a due process claim based on his custodial status.

### L.    Unknown Mailroom Staff

Williams sues unknown members of the mailroom for withholding his legal and personal mail for six months, which the undersigned takes as bringing a claim under the First Amendment. *See* Dkt. No. 29-1 at 45. "A prison official's interference with a prisoner's legal mail may violate the prisoner's constitutional right of access to the courts." *Brewer v. Wilkinson*, 3 F.3d 816, 820 (5th Cir. 1993). But to state a constitutional claim, a prisoner must show that "his position as a litigant was prejudiced by the mail tampering." *Walker v. Navarro Cnty. Jail*, 4 F.3d 410, 413 (5th Cir. 1993). Williams has not alleged any facts to indicate that his position as a litigant was prejudiced by the delay in receiving his legal mail; therefore, he has failed to state a claim.

---

[6] One of these delays appears to have been caused by the fact that Williams's unit was on lockdown. *See* Dkt. No. 29-1 at 50.

### M.    Unknown Securus Tech Department Staff

Williams sues unnamed individuals at Securus Tech Department for placing or failing to remove fraudulent charges on his inmate account, issuing him faulty tablets, and failing to assist him with technical problems. *See* Dkt. No. 29-1 at 59. Even assuming that these individuals qualify as state actors, to the extent that the fraudulent fees constitute a deprivation of property, Williams must seek relief in state court. *See Stauffer*, 741 F.3d at 583. Beyond that, the undersigned is unaware of how these complaints implicate Williams's constitutional rights. Rather, they are patently frivolous and should be dismissed on that basis.

### N.    Unknown TDCJ Staff

Williams sues unnamed TDCJ employees for having "practice[d] negligence when individually dealing with me" and harassed him on "more than a few occasions." Dkt. No. 29-1 at 59. The Supreme Court has routinely held that negligent conduct is insufficient to plead a viable § 1983 claim. *See, e.g.*, *Daniels v. Williams*, 474 U.S. 327, 328 (1986) ("We conclude that the Due Process Clause is simply not implicated by a *negligent* act of an official causing unintended loss of or injury to life, liberty, or property.") (emphasis in original). Moreover, Williams has not expounded upon his allegations in any detail and instead raises general grievances and behavior already covered by his myriad other claims. *See* Dkt. No. 34 at 7–8. Thus, the claims against Unknown TDCJ Staff are both legally and factually frivolous and should be dismissed accordingly.

### O.    TDCJ

Williams attempts to sue TDCJ itself, alleging that it spearheaded a campaign of negligence and harassment against him. *See* Dkt. No. 29-1 at 60. But Williams cannot bring suit against TDCJ because any claim against it is barred by Eleventh Amendment immunity. *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144 (1993) ("Absent waiver, neither a State nor agencies acting under its control may be subject to suit in federal court.") (quoting *Welch v. Tex. Dep't of Highways & Pub. Transp.*, 483 U.S. 468, 480 (1987) (internal quotation marks omitted)). Any claims against TDCJ should be dismissed because they seek relief from a defendant immune from such relief.

### P.    Retaliation

Williams brings general allegations of retaliation against each defendant. "To prevail on a claim of retaliation, a prisoner must establish (1) a specific constitutional right, (2) the defendant's intent to retaliate against the prisoner for his or her exercise of that right, (3) a retaliatory adverse act, and (4) causation." *Morris v. Powell*, 449 F.3d 682, 684 (5th Cir. 2006) (citing *McDonald v. Steward*, 132 F.3d 225, 231 (5th Cir. 1998)).

In evaluating such claims, the Fifth Circuit has cautioned that "prisoners' claims of retaliation are regarded with skepticism" and should be "carefully scrutinized by the courts." *Adeleke v. Fleckenstein*, 385 F. App'x 386, 387 (5th Cir. 2010) (per curiam) (citing *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995)). Conclusory allegations, including a prisoner's personal belief that he is the victim of retaliation, are insufficient to support a retaliation claim. *Jones v. Greninger*, 188 F.3d 322, 325 (5th Cir. 1999) (per curiam) (citing *Johnson v. Rodriguez*, 110 F.3d 299, 310 (5th Cir. 1997)). Instead, "[t]he inmate must

32

produce direct evidence of motivation or, the more probable scenario, allege a chronology of events from which retaliation may plausibly be inferred." *Haddix v. Kerss*, 203 F. App'x 551, 554 (5th Cir. 2006) (per curiam) (quoting *Woods*, 60 F.3d at 1166 (internal quotation marks omitted)).

Williams has not produced any direct evidence of a retaliatory motive. Rather, he raises conjecture and his subjective beliefs that the defendants have singled him out for reasons he never adequately develops. While it is true that Williams has found himself the target of multiple disciplinary cases and investigations, the chronology of events he alleges is simply too attenuated to allow for an inference of retaliation. Thus, any and all allegations of retaliation are frivolous and fail to state a plausible claim for relief.

### Q.    Conspiracy

Finally, Williams alleges that he has been the victim of a wide-ranging conspiracy in the form of a campaign of negligence and harassment. To advance a viable conspiracy claim under § 1983, a plaintiff must show (1) "an actual violation of [Section] 1983" and (2) "an agreement by the defendants to commit an illegal act." *Leggett v. Williams*, 277 F. App'x 498, 501 (5th Cir. 2008). Without an underlying actionable Section 1983 claim, no actionable conspiracy claim exists. *Kerr v. Lyford*, 171 F.3d 330, 341–42 (5th Cir. 1999), *abrogated on other grounds by Castellano v. Fragozo*, 352 F.3d 939 (5th Cir. 2003). And "[m]ere conclusory allegations of conspiracy cannot, absent reference to material facts, state a substantial claim of federal conspiracy." *Id.* (citing *Hale v. Harney*, 786 F.2d 688, 690 (5th Cir. 1986)). In pleading these specific facts, a plaintiff must allege the operative

facts of the alleged conspiracy. *Lynch v. Cannatella*, 810 F.2d 1363, 1369–70 (5th Cir. 1987).

First, the only plausible § 1983 claim is the excessive-force claim relating to the January 2020 Incident. Thus, any conspiracy claim must be tethered to that event. Williams, however, has alleged no facts to plausibly suggest that the defendants had an agreement to use excessive force against him. His speculation and subjective beliefs are not enough to sustain a viable claim. The Court should dismiss his conspiracy claim as factually frivolous and for failure to state a claim.

## VI.  LEAVE TO AMEND

Generally, "a *pro se* litigant should be offered an opportunity to amend his complaint before it is dismissed." *Brewster v. Dretke*, 587 F.3d 764, 767–68 (5th Cir. 2009). Leave to amend is not required, however, where an amendment would be futile, in other words, the amended complaint would still fail to state a claim, *Marucci Sports, LLC v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 378 (5th Cir. 2014), or where a plaintiff has already received an opportunity to amend his or her claims, *Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 556 (5th Cir. 2007).

Here, the Court permitted Williams to supplement his claims through his Supplemental Complaint (Dkt. No. 29) and responses to the Court's questionnaire (Dkt. Nos. 16, 34). Given these previous opportunities, the undersigned finds that Williams has pleaded his best case and recommends that the Court deny him further leave to amend.

## VII.  CONCLUSION

For the reasons explained above, the undersigned RECOMMENDS that the Court:

34

(1) ORDER O'Connor, Villanueva, Lofton, and Vasquez to file an answer or response to Williams's excessive-force claim related to the January 2020 Incident; and

(2) DISMISS all other claims with prejudice.

## VIII. RIGHT TO OBJECT

A copy of these Findings, Conclusions, and Recommendations shall be served on all parties in the manner provided by law. Any party who objects to any part of these Findings, Conclusions, and Recommendations must file specific written objections within fourteen days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). To be specific, an objection must identify the specific finding or recommendation to which the objection is made, state the basis for the objection, and specify the place in the magistrate judge's Findings, Conclusions, and Recommendations where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

## IX.  TRANSFER OF CASE

Having completed the preliminary screening of Williams's claims, the undersigned ORDERS that this case be TRANSFERRED back to the docket of the United States District Judge and designated as Civil Action No. 1:21-CV-89-H.

ORDERED this 6th day of August 2024.

_____

JOHN R. PARKER
UNITED STATES MAGISTRATE JUDGE